# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **ESTATE OF JACOB JAMES DERBIN,** <br> **By Administrator Dawn Derbin,** <br> c/o FG+G, 35 East 7th Street, Ste 201 <br> Cincinnati, Ohio 45202, <br><br>     **Plaintiff,** <br><br> -vs- <br><br> **CITY OF EUCLID,** <br> **CHIEF SCOTT MEYER,** <br> **OFFICER SAMUEL JACKSON,** <br> **SERGEANT DAN FERRITO,** <br> **SERGEANT MATTHEW GILMER,** <br> **CAPTAIN MITCHELL HAUSER,** <br> **CAPTAIN MICHAEL JANSON,** <br> **LIEUTENANT DAVE OLSZEWSKI,** <br> **SERGEANT DAVID MASLYK,** and <br> **SERGEANT NICK EDDINGTON,** <br> and **POLICE JOHN AND JANE DOES 1-15,** <br> c/o City of Euclid Law Department <br> 585 E. 222nd Street <br> Euclid, Ohio, 44123, <br><br> and <br><br> **NICK DiCICCO,** <br> **LISA DAVET,** <br> **LUSHONDA HALL-EDMISTON,** and <br> **NICHOLAS KOMAN,** <br> and **DISPATCH JOHN AND JANE DOES 1-5,** <br> c/o Chagrin Valley Dispatch <br> 4470 Oakes Road, <br> Brecksville, Ohio 44141, <br><br>     **Defendants.** | Case No. <br><br> Judge <br><br><br><br><br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

The Estate of Jacob Derbin, by and through Administrator Dawn Derbin, for the Estate's

Complaint against Defendants states as follows:

**Introduction**

1.      On May 11, 2024, Jacob Derbin, a 23-year-old City of Euclid Police Officer, was shot and killed while on duty in the City of Euclid, Ohio.

2.      Jacob Derbin's injuries and death were preventable and resulted directly and proximately from the acts and omissions of the Euclid Police Department ("EPD") and Chagrin Valley Dispatch ("CVD") and their respective personnel and leadership.

**Parties**

3.      The **Estate of Jacob James Derbin** is represented in this matter by **Administrator Dawn Derbin, Plaintiff**. Dawn Derbin is also Jacob Derbin's mother. Ms. Derbin was appointed Administrator of her son's Estate by the Probate Court of Cuyahoga County, Ohio, Case No. 2024-EST-289737, on October 24, 2024. Ms. Derbin is a resident of Cuyahoga County, Ohio.

4.      Defendant **City of Euclid** is an Ohio municipal corporation that operates the Euclid Police Department. The City is a unit of local government duly organized under the laws of the State of Ohio. The City is a "person" acting under color of law under 42 U.S.C. § 1983. The City was the employer and principal of the **Police Defendants** at all times relevant. The City is also responsible for the policies, practices, and customs of the Euclid Police Department.

5.      The **Police Defendants** include **Euclid Police Department** ("EPD") **Chief Scott Meyer, Officer Samuel Jackson, Sergeants Dan Ferrito** and **Matthew Gilmer, Captain Mitchell Hauser, Captain Michael Janson, Lieutenant Dave Olszewski, Sergeant David Maslyk**, **Sergeant Nick Eddington**, and **Police John and Jane Does 1-15**, who, at all relevant times, were certified peace officers for the City of Euclid's Police Department and had a duty of care to Jacob Derbin. At all relevant times, the Police Defendants acted under color of state law and within the course and scope of, and in furtherance of, their employment with the EPD, and

2

were the City of Euclid's agents, employees, and/or officers. They are sued in their individual capacities.

6. The **Dispatch Defendants** include **Nick DiCicco**, current CVD Administrator and/or Director, **Lisa Davet**, Assistant Director and/or Deputy Director of CVD in 2024, and Dispatchers **Lushonda Hall-Edmiston** and **Nicholas Koman, and Dispatch John and Jane Does 1-5** who, at all relevant times, were employed by and for the operation of **Chagrin Valley Dispatch** ("CVD") and had a duty of care to Jacob Derbin. At all relevant times, the Dispatch Defendants acted within the course and scope of, and in furtherance of, their employment with CVD, and were CVD's agents and/or employees. They are sued in their individual capacities.

### Jurisdiction and Venue

7. This Court has jurisdiction pursuant to the Civil Rights Act, 42 U.S.C §1983 *et seq.*, 28 U.S.C. §1331 and 1343(a), and the Fourth and Fourteenth Amendments of the Constitution of the United States.

8. This Court has supplemental jurisdiction over the related state law claims under 28 U.S.C. §1367.

9. Venue in this District is proper under 28 U.S.C. §1391(b)(1) and (b)(2). The parties reside, or, at the time the events took place, resided in this judicial district, and the events giving rise to Plaintiff's claim also occurred in this judicial district.

### Facts

10. On May 11, 2024, Jacob Derbin was on duty as a City of Euclid Police Officer.

11. During the evening of May 11, 2024, at approximately 9:15 PM, Tania Madden called 911. Ms. Madden's initial call was brief: she said, "I need Euclid," and the call disconnected.

12. Dispatcher Lushonda Hall-Edmiston, of Chagrin Valley Dispatch, attempted to call Madden back but there was no answer.

13. Dispatcher Hall-Edmiston coded Madden's call as a "911 Hang Up."

14. Minutes later, Madden called back and spoke with Dispatcher Hall-Edmiston.

15. On this call, Madden reported to Dispatcher Hall-Edmiston that: she was in a domestic violence altercation with her son's father, De'Shawn Vaughn; he already threatened her family; he already shot her brother; he threatened to shoot her grandfather; he had just been outside of her grandmother's house; and he had just sent text messages threatening to shoot Ms. Madden and her mother.

16. Dispatcher Hall-Edmiston told Ms. Madden that dispatch would "get someone over there as soon as an officer's available." She obtained from Ms. Madden information about Vaughn's vehicle, her mother's name, Vaughn's name and date of birth, the owner of the house – her grandfather, and asked why Vaughn was upset with her that day.

17. Madden reported to Dispatcher Hall-Edmiston that the US Marshals were looking for and could not find Vaughn, and that he was upset because she did not want to be with him anymore. Dispatcher Hall-Edmiston assured Madden again that an officer would be sent over as soon as one was available.

18. Dispatcher Hall-Edmiston's notes entered into the dispatch system did not include critical information provided by Madden.

19. Dispatcher Hall-Edmiston's notes stated only that Madden was receiving threatening messages from her child's father to do harm to her and her mother; that she had received text messages from Vaughn; that Vaughn should be driving a white Volkswagen with 30 day tags, but Madden was unsure of the owner.

20. Hall-Edmiston's omission of critical information from her dispatch entry was negligent and reckless.

21.     Despite information provided and making assurances that an officer would be sent as soon as possible, Hall-Edmiston also recklessly failed to escalate the priority and update the incident type from "911 Hang Up" and to otherwise initiate the timely dispatch of officers to Madden's location.

22.     Approximately eight minutes later, CVD Dispatcher Nicholas Koman entered into the dispatch system that officers were tied up on two other calls.

23.     Approximately 40 minutes after Madden first called 911, an EPD officer asked Dispatcher Koman what pending calls remained. Koman replied, "All we have left is a 911 hang up," and reported the limited information contained in Dispatcher Hall-Edmiston's deficient dispatch entry.

24.     That EPD officer, Samuel Jackson, told Koman to "show [him] responding with 14," in reference to Jacob Derbin.

25.     Dispatcher Koman responded, "Just be advised, we were out there on May 7. This house was added to the special attentions list for threatening messages. The male is showing a 99 [warrant] for a weapons offense. Approach with caution."

26.     Despite having known this information about the home associated with the 911 Hang Up, Koman recklessly failed to dispatch an officer to the location for nearly 40 minutes after the initial call, and sent officers to lower priority calls.

27.     Only when Koman was specifically asked about what calls were left did he provide information to officers on duty about the call to Madden's home.  Koman still did not specifically direct officers to respond to the home.

28.     Jacob Derbin responded on the radio, "Do you have a disposition for what happened to that call?"

29.     EPD officer Gabrielle Crombie chimed in on the radio, saying, "1441 wrote report for that. The warrant's for felonious assault – he shot his girlfriend's brother nine times and then threatened to kill the grandpa over there too."

30.     EPD Officer Alicia Mitchell reported on radio that she would also respond to the home, and that Jackson could disregard. He said he was on the way already.

31.     EPD Officers Jackson, Mitchell, and Derbin traveled to the home in their police cruisers.

32.     The three responding officers were not veteran officers.

33.     Jacob Derbin was a new police officer at the time, having been certified by the State of Ohio and appointed as a Euclid police officer for less than one year, since approximately July 2023.

34.     Officer Mitchell was also a new officer at the EPD, certified by the State of Ohio as an officer only since February 2023.

35.     Samuel Jackson had been a certified police officer for only about five years at the time and had been employed by the Euclid Police Department only since September 2022.

36.     At this time, EPD Sergeants Dan Ferrito and Matthew Gilmer were on duty as shift supervisors.

37.     Upon information and belief, all radio traffic about the call to Madden's house was transmitted and audible to Sergeants Ferrito and Gilmer prior to Derbin, Mitchell, and Jackson's arrival on scene.

38.     Despite having the opportunity to do so, at no time did any EPD supervisor, including but limited to Gilmer and Ferrito, instruct or suggest that these three officers consider or develop a tactical plan, hold or participate in a tactical briefing, determine role assignments or

containment or perimeter plans, or any other cautionary planning or tactics to be taken prior to approaching the home or during the call.

39.     Sergeants Ferrito and Gilmer recklessly failed to instruct and supervise Derbin, Mitchell, and Jackson as they responded to this call involving a known dangerous person with a prior history of being armed and of threatening and shooting people.

40.     Ferrito and Gilmer also recklessly failed to respond to the scene or actively oversee this operation by this group of relatively inexperienced and new-to-EPD officers to ensure their use of tactical planning and tactical approach.

41.     Likewise, Jackson – the most experienced officer on scene and with knowledge that Vaughn was known to be armed, to shoot people, and was actively making threats – recklessly failed to initiate cautionary planning or a safe tactical response for the three officers' approach to the house.

42.     Once at the home, Derbin and Mitchell approached the home's side door, which opened onto the left side of the driveway. Jackson stood in the drive several feet back from the side door, toward the street, near the rear of a parked vehicle in the driveway.

43.     Madden initially stayed inside, stating to them her fearfulness and concern about coming outside, saying, "I know you're the police, but I don't feel safe."

44.     Mitchell responded, "Well, he's in a car, right?" Madden replied, "No, he's on feet." Other family members came to the door and pointed to locations where they had seen Vaughn outside the home, including the backyard of the house next door.

45.     Derbin, Mitchell, and Jackson then heard from Madden information she had previously reported to Dispatcher Hall-Edmiston:  that she and Vaughn had a domestic dispute,

that Vaughn had shot her brother, and was threatening her, texting her saying he was going to shoot her and her mother.

46. Derbin asked, "Do you want us to check the area for him?" Madden responded that she wanted the police to arrest him, saying that Vaughn was supposed to be in jail and that the US Marshals had been looking for him since Wednesday. Jackson asked what Vaughn was wearing, and Madden responded that he was wearing all black and had been "literally standing right here."

47. Derbin asked, "Can I go to the backyard and look?" Madden replied, "Go ahead. You have every permission to go back there."

48. As Madden began to tell Mitchell about text messages from Vaughn, Derbin took only a few steps up the driveway, toward the rear of the house, with just a flashlight in his hand – when shots suddenly rang out.

49. Jacob Derbin began to fall to the ground.

50. Officer Mitchell ran and took cover around the front of the house.

51. Officer Samuel Jackson, who had remained near the rear of the vehicle in the driveway, intentionally discharged several shots.

52. Jackson's position placed Jacob Derbin forward of Jackson's firing line.

53. Jackson's position placed Jacob Derbin in Jackson's cone of fire.

54. Jackson aimed his shots toward Jacob Derbin's location.

55. In the cross-fire between Vaughn and Jackson, Jacob Derbin was shot seven times, with four of those shots causing through-and-through injuries, and three shots resulting in penetrating wounds with bullets lodged in his body. Additional projectiles struck but did not pierce his bullet-proof vest.

56. As Jacob Derbin lay on the ground, moaning and saying, "No, no, Sam, Sam," and

8

"Sam, please help me," Jackson asked Jacob, "Where's he at?" Jacob responded in agony, "He's back there. Help, help!"

57. Officers Mitchell and Jackson both called over the radio that there was an officer down and requested that EMS (Emergency Medical Services) respond.

58. However, neither Jackson nor Mitchell themselves attempted to render aid or move Jacob from danger so that first aid could be rendered.

59. Jackson, as senior officer on the scene, and in his statements to other officers as they arrived, knew that it was critical to move Jacob to a place of safety. He had the opportunity to render aid and/or move Jacob with Mitchell on the scene to aid him. Jackson's failure to render aid and to move Jacob Derbin to a safe location where medical care could be accessed was reckless and was deliberately indifferent to Jacob's serious medical needs.

60. Other EPD officers arrived on scene, including Ferrito and Gilmer. Finally they pulled Jacob to the street. But when they got to that location, instead of loading him into a cruiser and racing him to the hospital, where, upon information and belief, it would have been possible to save his life, Jacob remained on the street for several more minutes. Police Defendants' failure to take action to ensure Jacob's safety and access to medical care was reckless and was deliberately indifferent to Jacob's serious medical needs.

61. Defendant Police Officers finally moved Jacob to a location further down the street where EMS could begin rendering aid approximately nine minutes after he was first shot. EMS was then able to take him into the ambulance and leave the scene minutes later.

62. Jacob became unresponsive on the journey to the hospital. He died shortly after his arrival there.

63. Jacob Derbin's cause of death was multiple gunshot wounds.

64. In the aftermath of the shooting, Jackson repeatedly made statements captured on body worn camera that he had not seen Vaughn and that he did not know where the shots were coming from. Jackson nonetheless fired his weapon.

65. Jacob Derbin was visibly in Jackson's cone of fire as Jackson shot in response to a suspect whose location he did not know.

66. With Jacob directly in Jackson's firing line, Jackson created an obvious crossfire hazard when he fired those shots.

67. The risk of striking Jacob Derbin during cross-fire was known to or should have been obvious to Jackson.

68. Upon information and belief, Jackson recklessly, unreasonably, and with deliberate indifference shot toward and struck Jacob Derbin in the cross-fire, without probable cause, in violation of Derbin's rights under the United States Constitution. Pleading in the alternative, Jackson recklessly, unreasonably, and with deliberate indifference shot toward Derbin, prolonging the gun battle with Vaughn and increasing injury to Derbin, in violation of Derbin's rights under Ohio law. As Jackson fired these shots, he was not shooting at Vaughn as he admittedly did not know where Vaughn was.

69. Later that night, the Euclid Police Department requested that the Ohio Bureau of Criminal Investigation (BCI) conduct an independent investigation into the facts and circumstances surrounding the death of Jacob Derbin.

70. However, investigating BCI agents were not provided by the Euclid Police Department and its personnel with certain information that would have provided significant insight into the events leading to and causing Jacob Derbin's suffering and death.

71. Not a single member of the Euclid Police Department gave a statement or sat for an interview with BCI.

72. Neither Jackson nor Mitchell gave their accounts of what happened to Jacob Derbin to BCI in any form.

73. Neither Jackson nor Mitchell wrote a report for the EPD about these events. Upon information and belief, and no supervisor conducted a use of force review or authored a use of force analysis report, as required by EPD's Use of Force policy.

74. In this case, on May 11, 2024, and prior to the shooting of Jacob Derbin, other failures of the EPD, Chief Meyer, and EPD's chain of command staff were already evident.

75. All three officers' approach to and actions as they responded to Madden's call at the home – without any cautionary planning or use of a safe tactical response – exposes obvious failures by EPD to train and supervise its officers, including Derbin, Mitchell, and Jackson on the night of May 11, 2024.

76. Sergeants Ferrito and Gilmer knew or should have known that planning and use of a safe tactical response was necessary under the circumstances.

77. The failures of these on-duty supervisors Gilmer and Ferrito to ensure tactical and cautionary planning or a safe tactical response for these officers further demonstrates their specific failure to supervise these officers on May 11, 2024.

78. Jackson, the most senior officer on scene, likewise knew or should have known that planning and using a safe tactical response were necessary under the circumstances known to him both prior to encountering Madden at the home and after learning additional information from her. Jackson knew or should have known that failing to take such an approach presented an obvious risk of harm to officers and others.

11

79.     Jackson further knew or should have known that allowing Jacob Derbin to initiate a search on his own in the back yard presented an obvious risk of harm to Jacob Derbin.

80.     The risk of failing to engage in cautionary planning or tactics in advance of and during this call was known to or should have been known to Jackson, Ferrito, and Gilmer. The risk of harm in failing to take such actions was obvious.

81.     The vulnerability of Jacob Derbin, a minimally experienced officer, operating without adequate training, actual supervision, or direction to engage in a safe tactical response – both on May 11, 2024 from supervisors Gilmer and Ferrito, and from Jackson on scene, and in general through the training and supervision he received from EPD  – was foreseeable and presented an obvious risk of harm to Jacob.

82.     In fact, Vaughn had been known to EPD since at least 2016 as a person who engaged in both threats and actual acts of serious violence, and EPD had responded just four days before these events to the same house from which Madden now called. On May 7, 2024, Madden reported threats by Vaughn to EPD. The report for this event stated that EPD was aware that Vaughn was considered "armed and dangerous."  Yet Ferrito and Gilmer took no action to ensure their officers were equipped and directed to handle the call safely.

83.     In relation to this May 7 event, EPD Officer Gabrielle Crombie added a briefing in EPD's officer roll call to make other officers aware of Vaughn and the threat of violence he posed.

84.     This particular roll call briefing had, upon information and belief, been removed by the Police Defendants and/or Police Supervisor Defendant(s) prior to May 11, 2024, depriving Jacob Derbin of the opportunity to learn it in advance of responding to the call from Madden.

85.     Crombie also explained in the aftermath of the shooting why she shared information – which had been provided to Dispatcher Hall-Edmiston but not included in her written entry –

12

over radio prior to officers arriving on scene. She stated, "I knew it was going to go south."

86. Yet the EPD, through Chief Meyer and its command staff, did not discipline any officer for their conduct in relation to this call or Jacob Derbin's death, including but not limited to no discipline for Jackson, Gilmer, and Ferrito.

87. The Police Supervisor Defendants failed to ensure that the officers hired by the department were equipped to safely handle calls like the one that led to Jacob Derbin's death. These Defendants also failed to institute adequate policies and training to ensure the use of safe tactical approaches and lawful use of force for situations such as the call leading to Jacob's death.

88. Defendant Chief Meyer and his command staff, including but not limited to Defendants Captain Mitchell Hauser, Captain Michael Janson, Lieutenant Dave Olszewski, and Sergeant David Maslyk, were responsible for hiring and training of officers during the period when Jackson, Mitchell, and Derbin were hired and onboarded by the EPD. These Defendants and Sergeants Gilmer, Ferrito, Eddington, and some of Police John and Jane Does 1-15, (collectively, "Police Supervisor Defendants"), had a duty to the public and to Jacob Derbin to exercise reasonable care in operating the EPD, which included, *inter alia*, operating the department in a safe manner, protecting all officers – including Jacob Derbin – from unreasonable risks of harm while on duty, adequately training all officers to safely perform policing activities, and instituting active and adequate supervision of officers to ensure safe performance of policing activities.

89. The Police Supervisor Defendants, through their acts and/or omissions, disregarded and/or were indifferent to the risk of harm to Jacob Derbin, failed to exercise due care toward Jacob Derbin, and breached their duties to him in the manners described in this Complaint and by, *inter alia*, failing to: supervise the officers responding to Madden's call; ensure these officers were adequately trained to safely respond to Madden's call; ensure officers were adequately trained on

13

lawful and proper use of force, including deadly force; ensure EPD hired officers equipped to use deadly force only in a lawful manner; ensure that EPD operations, policies, practices, and customs applicable to the events at issue in this case were not deficient and did not disregard or were not indifferent to risks of harm to officers and others; ensure steps are taken permit rendering of first aid urgently, and to ensure that the aid is actually rendered, after a use of force; ensure that appropriate EPD operations, policies, practices, and customs applicable to the events at issue here were actually and properly applied and enforced; ensure that EPD officers policing duties were performed such that they did not disregard or were not indifferent to risks of harm to others; take actions to correct known deficiencies in EPD officer practices and customs concerning responding to calls involving threat of violence and concerning use of deadly force; and take action to correct deficiencies relating to officer and supervisor/administrator training.

90.     The Police Supervisor Defendants' reckless acts and omissions caused Jackson, Mitchell, and Derbin to fail to use safe tactical planning and tactical approach in responding to Madden's call.

91.     These Defendants' reckless acts and omissions also caused Jackson to improperly, recklessly, and unreasonably discharge his firearm with Jacob Derbin directly in the cone of fire.

92.     Further, the EPD and its leadership, including but not limited to Chief Scott Meyer and his command staff, which includes the Police Supervisor Defendants, did not order or provide full cooperation of the department with BCI's investigation.

93.     The Police Defendants' opposition to transparency was evident not only in failures to provide statements or interviews to BCI by Jackson, Mitchell, and all other EPD officers with knowledge, but also in other aspects of EPD's involvement in the investigation; for example, Defendant Sergeant Nick Eddington reported to BCI that "cameras are not working" for one home

14

near the scene, but, upon information and belief, this household had provided video to EPD.

94. EPD and the Supervisor Police Defendants further failed to complete a departmental investigation of circumstances leading to Jacob Derbin's suffering and death. These failures were reckless and demonstrate the EPD's failures of accountability and transparency.

95. EPD officials, including but not limited to Captain Michell Hauser and with the approval of Chief Meyer, failed to provide full transparency about the death of Jacob Derbin in their handling of his death and in statements to the media, which deprived Jacob's family and the public of a truthful account of these events.

96. Defendants' conduct and failures were reckless and deprived Jacob Derbin and his heirs of their rights to fairness and respect for their dignity, and of their right to have justice administered without denial or delay, among other rights.

97. The death of Jacob Derbin is not the first event for which the EPD, Chief Scott Meyer, and his command staff, including the Supervisor Police Defendants, have failed to conduct adequate, transparent investigations and to seek accountability for excessive force events, other misconduct, and reckless policing by EPD officers.

98. The death of Jacob Derbin is also not the first event that has exposed the failure of the EPD, Chief Scott Meyer, and his command staff, including the Supervisor Police Defendants, to train and supervise officers such that excessive force, officer misconduct, and reckless policing actions are prevented.

99. Notable cases and investigations have exposed repeated misconduct, including but not limited to improper use of force and deadly force and other improper execution of policing duties, as well as repeated failures of the EPD and the Supervisor Police Defendants to adequately

investigate or discipline its officers for misconduct, and to ensure safety and render aid after uses of force. Examples of such matters include:

a. 2016 beating of Erimus Spencer by EPD officers Michael Amiott and Shane Rivera, resulting in a civil settlement but without discipline for either officer;

b. 2016 assault of Lamar Wright with taser and OC spray by EPD officers Kyle Flagg and Vashon Williams, resulting in a civil settlement and no discipline to either officer;

c. 2017 beating of Richard Hubbard by EPD officer Michael Amiott, who was reinstated to employment in the EPD even after he was initially found guilty of assault and interfering with civil rights and terminated from employment;

d. 2017 assault of two women by then-officer Daniel Ferrito (and Defendant in this case), resulting in a civil settlement and no discipline for Ferrito;

e. 2017 arrest of Shajuan Gray by EPD officer James Aoki who illegally entered her apartment and arrested her while she wore only a bath towel, resulting in a civil settlement and no discipline for Aoiki;

f. 2017 shooting death of Luke Stewart, who was unarmed, by EPD officer Matthew Rhodes, resulting in a civil jury verdict for Stewart's family and no discipline for Rhodes;

g. 2024 dangerous police vehicle pursuit in violation of EPD policy, resulting in the death Michelle Wall, an innocent motorist, with the pursuit initiated by EPD officer Benjamin Wilcox and supervised by then-Lieutenant Vashon Williams, resulting in no discipline to any officer.

100. The United States Court of Appeals for the Sixth Circuit found in its decision in Lamar Wright's case that there was evidence sufficient to present to a jury that the EPD maintained an unlawful policy on use of force by its officers, and that "a reasonable jury could find that the City's excessive-force training regimen and practices gave rise to a culture that encouraged, permitted, or acquiesced to the use of unconstitutional excessive force, and that, as a result, such force was used on Wright." The Sixth Circuit also found that where the EPD sergeant who conducted use of force trainings for the department testified that he had *never* heard of a use of force incident by a Euclid officer that seemed inappropriate to him, this "move[d] the needle so

16

that a reasonable jury could decide that use of excessive force is ratified by the department," and that "a reasonable jury could likewise find that [Chief] Meyer and [the sergeant's] seeming failure to ever meaningfully investigate excessive force complaints rises to the level of a ratification of use of force by a policymaker." *Wright v. City of Euclid*, 962 F.3d 852 (6th Cir. 2020).

101. The sergeant's testimony – that he *never* heard of a use of force incident by a Euclid officer that seemed inappropriate to him – was given in 2018 after every misconduct event described in the prior paragraph at (a) through (f).

102. Notably, Chief Meyer was appointed to this role in the EPD in December 2016, in the midst of these ongoing misconduct events.

103. In the earlier federal litigation in Luke Stewart's case, prior to the state court jury verdict in his Estate's favor, a federal judge for the United States District Court for the Northern District of Ohio found that "the Euclid Police Department seems to view the use of force (including deadly force) with cavalier indifference." *Stewart v. City of Euclid*, No. 1:17-CV-2122, 2018 WL 7820181 (N.D. Ohio July 13, 2018).

104. The EPD police misconduct alleged in this Complaint, in relation to the death of Jacob Derbin and aftermath, was undertaken pursuant to the EPD's ongoing unconstitutional policies, practices, and customs, including but not limited to illegal use of force and a code of silence, as well as inadequate training and supervision of officers where the need for more and different training was obvious, in relation to, *inter alia*, the use of force, the unsafe approach to the home, and the necessity of rendering aid urgently after a use of force.

105. The aftermath of Jacob Derbin's death also revealed EPD's ongoing unlawful policies and official ratification of misconduct by way of a code of silence. As part of the cover-up mechanism to insulate the above-described varieties of misconduct, and in a similarly

17

entrenched and long-lasting pattern and practice, City policy makers and EPD offices and supervisors alike facilitated a code of silence within the EPD. In accordance with this code, officers refused to report, and otherwise lied about, misconduct committed by themselves and their colleagues. The City's training, supervisory, and disciplinary practices supported this code of silence, by protecting from discipline officers who engaged in misconduct and teaching police officers that they must abide by the code.

106. The code of silence is evident here in, *inter alia*, the refusal of all EPD officers to give statements or interviews to BCI, and the lack of any EPD investigation, report, or disciplinary action accounting for the missteps and misconduct, and the reckless and unreasonable provision of incomplete information and misrepresentations to BCI by the Police Defendants. The EPD, the Police Supervisor Defendants, and Police Defendants contributed to the continuation of the code of silence here.

107. As with almost every earlier misconduct event described above, there was no discipline for any officer and no legitimate investigation by the EPD into its officers' misconduct in this case.

108. As a result of the established practice of failing to identify, investigate, supervise, or discipline officers accused of serious misconduct, and in facilitating a code of silence within the EPD, EPD officers have come to believe that they may violate rights, breach their duties, and/or engage in misconduct without fear of consequences from their leadership or the City.

109. At all times relevant to this Complaint, policymakers for the City and the EPD – including Chief Meyer, among others – knew of all these problems, allowed them to continue, and made decisions not to implement adequate policies, training, or supervision, even though the need

for a legitimate mechanism for new or different policies, training, oversight, or punishment of officers was obvious.

110.    The widespread pattern and practices described herein were so well settled as to constitute a de facto policy in the EPD, and municipal policymakers exhibited deliberate indifference to the problem, ratifying it.

111.    The Euclid Police Department's culture as described above materially increased the risk of fatal harm to Jacob Derbin.

112.    BCI's investigation also revealed further recklessness in Chagrin Valley Dispatch's handling of events that night, showing the ways in which CVD also materially increased the risk of fatal harm to Jacob Derbin.

113.     A BCI interview established that Ms. Madden's grandmother had also called 911 to report that Vaughn was at the house next door, but a dispatcher put her on hold.

114.    Defendants Nick DiCicco, Administrator and/or Director of CVD, and Lisa Davet, Assistant Director and/or Deputy Director of CVD, as first and second persons in charge of the operations of CVD, had a duty to ensure that CVD employees, including dispatchers, were adequately staffed, trained, and supervised to competently and consistently perform their duties.

115.    DiCicco and Davet in their roles in CVD also have a duty to ensure that CVD operates in compliance with Ohio Revised Chapters 128, et seq. and 307, et seq., and Ohio Admin. Code Chapter 5507-1. Upon information and belief, DiCicco and Davet have failed to ensure such compliance.

116.    Though job duties for dispatchers require compliance with CVD procedures, upon information and belief, CVD, through DiCicco and Davet, does not maintain adequate training, policies, and procedures to ensure that CVD dispatchers perform their jobs competently.

117. DiCicco and Davet had actual or constructive knowledge of the above-described deficiencies in the operation of CVD and failed to remedy them.

118. Dispatcher job duties also include accurately gathering pertinent information, receiving and transmitting updated information to officers, effectively prioritizing situations and making appropriate decisions based on information received, learning and applying new information, and dispatching emergency responders according to call priority.

119. The Dispatch Defendants had a duty to the public at large, including Jacob Derbin, to exercise due care while working as emergency dispatchers, to act in a lawful and reasonable manner, and to not act in a negligent or reckless manner. These Dispatch Defendants also had a duty to the police officers with and for whom they provided dispatch services, including Jacob Derbin, to exercise due care, to act in a lawful and reasonable manner, and to not act negligently or recklessly.

120. Dispatchers Hall-Edmiston and Koman failed to fulfil these duties on May 11, 2024. Hall-Edmiston and Koman incompetently performed their jobs on May 11, 2024 in relation to Madden's call.

121. The Dispatch Defendants acted negligently, recklessly, willfully, wantonly, and with deliberate indifference to the health and safety of 9-1-1 callers and first responders, including Jacob Derbin, in the ways described above. The Dispatch Defendants thereby created risk to Jacob Derbin's safety, and contributed to, and directly and proximately caused, Jacob Derbin's suffering and death.

122. All Defendants had an opportunity to protect the safety and life of Jacob Derbin and they acted negligently, recklessly, willfully, wantonly, and with deliberate indifference in failing to do so.

20

123. Defendants consciously disregarded and/or were indifferent to known or obvious risks of harm to Jacob Derbin that were unreasonable under the circumstances.

124. Defendants perversely disregarded known risks of harm to Jacob Derbin as described herein.

125. Defendants' conduct as described in this Complaint was unreasonable and had great probability of causing substantial harm to officers and the public, including Jacob Derbin.

126. Defendants had actual and/or constructive notice of the foreseeable risks and injuries to Jacob Derbin which resulted in his death, and of foreseeable risks and injuries to his heirs.

127. No Defendant is entitled to federal qualified immunity or Ohio statutory immunity for any act or omission described herein.

128. Jacob Derbin is survived by several family members, including his parents. Jacob's family members, in particular his mother and siblings, have suffered severe and ongoing mental anguish as a result of his death.

129. Jacob Derbin's surviving family members have also suffered the loss of Jacob Derbin's companionship, care, attention, assistance, services, society, consortium, protection, advice, guidance, counsel, social and financial support, prospective inheritance, and other damages to their detriment, now and in the future.

130. All Defendants are jointly and severally liable for the injuries sustained by Jacob Derbin and his beneficiaries.

**FIRST CLAIM FOR RELIEF:**
**Ohio Law Claim | Wrongful Death**
**Pursuant to Ohio R.C. § 2125.02**
**against all Defendants**

131. Plaintiff incorporates all above paragraphs as if fully set forth here.

21

132.    Defendants negligently, recklessly, willfully, wantonly, and with deliberate indifference caused the wrongful death of Jacob Derbin, resulting in damages recoverable under Ohio R.C. § 2125.02.

### SECOND CLAIM FOR RELIEF:
### Ohio Law Claim | Survivorship
### against all Defendants

133.    Plaintiff incorporates all above paragraphs as if fully set forth here.

134.    This action is brought for injuries and damages to Jacob Derbin prior to his death for the benefit of his Estate.

135.    As a direct and proximate result of the above-described conduct of Defendants, Jacob Derbin sustained severe, fatal injuries and excruciating pre-death pain and suffering.

### THIRD CLAIM FOR RELIEF:
### Ohio Law Claim | Breach of Duty
### against Police Defendants

136.    Plaintiff incorporates all above paragraphs as if fully set forth here.

137.    The Police Defendants, including Chief Scott Meyer, Officer Samuel Jackson, Sergeants Dan Ferrito and Matthew Gilmer, Captain Mitchell Hauser, Captain Michael Janson, Lieutenant Dave Olszewski, and Sergeants David Maslyk and Nick Eddington, owed a duty of care to Jacob Derbin under Ohio law.

138.    The Police Defendants' conduct was negligent, reckless, willful, wanton, and with deliberate indifference to the safety and life of Jacob Derbin.

139.    The Police Defendants recklessly breached the duty of care they owed to Jacob.

140.    It was foreseeable that Jacob Derbin would suffer injury or death from Defendants' negligent, reckless, wanton, willful and deliberately indifferent conduct, described above.

22

141.    The Police Defendants knew or should have known that their conduct would or could cause serious physical injury to Jacob Derbin and they disregarded that knowledge.

142.    The Police Defendants' conduct directly and proximately caused the injuries and damages suffered by Jacob Derbin, his Estate, and his beneficiaries as described above.

**FOURTH CLAIM FOR RELIEF:**
**Ohio Law Claim | Breach of Duty**
**against Dispatch Defendants**

143.    Plaintiff incorporates all above paragraphs as if fully set forth here.

144.    The Dispatch Defendants, including Nick DiCicco, Lisa Davet, Lushonda Hall-Edmiston, and Nicholas Koman, owed a duty of care to Jacob Derbin under Ohio law.

145.    The Dispatch Defendants' conduct was negligent, reckless, willful, wanton, and with deliberate indifference to the safety and life of Jacob Derbin.

146.    The Dispatch Defendants recklessly breached the duty of care they owed to Jacob.

147.    It was foreseeable that Jacob Derbin would suffer injury or death from Defendants' negligent, reckless, wanton, willful and deliberately indifferent conduct, described above.

148.    The Dispatch Defendants knew or should have known that their conduct would or could cause serious physical injury to Jacob Derbin and they disregarded that knowledge.

149.    The Dispatch Defendants' conduct directly and proximately caused the injuries and damages suffered by Jacob Derbin, his Estate, and his beneficiaries as described above.

**FIFTH CLAIM FOR RELIEF:**
**Ohio Law Claim | Ohio Revised Chapters 128, et seq. and 307, et seq.,**
**and Ohio Admin. Code Chapter 5507-1**
**against Dispatch Defendants**

150.    Plaintiff incorporates all above paragraphs as if fully set forth here.

151.    The Dispatch Defendants, including Nick DiCicco, Lisa Davet, Lushonda Hall-Edmiston, and Nicholas Koman, owed a duty of care to Jacob Derbin and the public pursuant to

23

Ohio Revised Chapters 128, et seq. and 307, et seq., and Ohio Admin. Code Chapter 5507-1.

152.   The Dispatch Defendants recklessly violated their duties under these Ohio laws and are liable for injuries and suffering of Jacob Derbin and his Estate.

153.    The Dispatch Defendants' conduct was negligent, reckless, willful, wanton, and with deliberate indifference to the safety and life of Jacob Derbin.

154.   It was foreseeable that Jacob Derbin would suffer injury or death from Defendants' negligent, reckless, wanton, willful and deliberately indifferent conduct, described above.

155.   The Dispatch Defendants knew or should have known that their conduct would or could cause serious physical injury to Jacob Derbin and they disregarded that knowledge.

156.   The Dispatch Defendants' conduct directly and proximately caused the injuries and damages suffered by Jacob Derbin, his Estate, and his beneficiaries as described above.

**SIXTH CLAIM FOR RELIEF:**
**42 U.S.C. § 1983 | Amend. IV & XIV — Excessive Force**
**against Defendant Officer Jackson and City of Euclid**

157.   Plaintiff incorporates all above paragraphs as if fully set forth here.

158.   Defendant Officer Jackson, acting under color of law, deprived Jacob Derbin of clearly established rights, privileges, or immunities secured to him by the Fourth and Fourteenth Amendments to the United States Constitution, including but not limited to, his right to be free from excessive force.

159.   Defendant Jackson used excessive, unreasonable, and gratuitous force in shooting toward and/or in striking Jacob Derbin.

160.    The force used by Defendant Jackson was a direct and proximate cause of the constitutional violations Jacob Derbin suffered and of his injuries and damages, described above.

24

161. Defendant City of Euclid was the moving force behind these violations of Jacob Derbin's rights as described in this Complaint.

## SEVENTH CLAIM FOR RELIEF:
### 42 U.S.C. § 1983 | Amend. IV & XIV — Deliberate Indifference to Serious Medical Needs against Police Defendants and City of Euclid

162. Plaintiff incorporates all above paragraphs as if fully set forth here.

163. The Police Defendants, acting under color of law, deprived Jacob Derbin of clearly established rights, privileges and immunities secured to him by the Fourth and Fourteenth Amendment to the United States Constitution, including, but not limited to, the right to constitutionally adequate medical care for his serious medical needs.

164. Defendants acted with recklessness and deliberate indifference to Jacob Derbin's serious medical needs through their acts and omissions described above.

165. Defendants' failures were a direct and proximate cause of the constitutional violations and injuries and damages suffered by Jacob Derbin, described above.

166. Defendant City of Euclid was the moving force behind these violations of Jacob Derbin's rights as described in this Complaint.

## EIGHTH CLAIM FOR RELIEF:
### 42 U.S.C. § 1983 | Supervisor Liability against Police Supervisor Defendants and City of Euclid

167. All the foregoing paragraphs are incorporated as fully set forth here.

168. The constitutional injuries described in this Complaint were proximately caused by (i) the intentional misconduct of the Police Supervisor Defendants, or (ii) by these Police Supervisor Defendants being deliberately and recklessly indifferent to their subordinates' misconduct, knowing that ignoring that misconduct would necessarily violate Plaintiff's constitutional rights.

25

169. The Police Supervisor Defendants were aware of, or facilitated, condoned, or oversaw the unconstitutional conduct of other Police Defendants.

170. The Police Supervisor Defendants acted under color of law and within the scope of their employment when they engaged in these actions and omissions.

171. As a direct and proximate result of acts and omissions of the Police Supervisor Defendants, Jacob Derbin's constitutional rights were violated and he suffered injuries and damages as set forth above.

172. Defendant City of Euclid was the moving force behind these violations of Jacob Derbin's rights as described in this Complaint.

**NINTH CLAIM FOR RELIEF:**
**42 U.S.C. § 1983 | *Monell* Claim**
**against Defendant City of Euclid**

173. Plaintiff incorporates all above paragraphs as if fully set forth here.

174. The actions of the Police Defendants, as alleged above, were taken pursuant to one or more interrelated de facto policies (written and/or unwritten), practices, customs, supervision of officers, and tolerance and ratification in the EPD as described above.

175. The interrelated policies, practices, customs, supervision, and training as alleged in this Complaint, individually and together, were maintained and implemented with deliberate indifference, and encouraged the Defendants to commit the acts against Jacob Derbin alleged in this Complaint.

176. Defendants acted under color of law and with unreasonable and deliberate indifference to the constitutional rights of Jacob Derbin.

177. Defendants' conduct, actions, and/or omissions were the direct and proximate cause of the violation of Jacob Derbin's Constitutional rights, suffering, anguish, and other injuries.

26

178. Defendant City of Euclid was the moving force behind and the direct and proximate cause of violations of Jacob Derbin's constitutional rights and damages suffered by him.

### TENTH CLAIM FOR RELIEF:
### Ohio Law Claim | Ohio Constitution
### against Police Defendants

179. Plaintiff incorporates all above paragraphs as if fully set forth here.

180. The Police Defendants, including Chief Scott Meyer, Officer Samuel Jackson, Sergeants Dan Ferrito and Matthew Gilmer, Captain Mitchell Hauser, Captain Michael Janson, Lieutenant Dave Olszewski, and Sergeants David Maslyk and Nick Eddington, owed a duty of care to Jacob Derbin under the Ohio Constitution.

181. The Police Defendants violated Jacob Derbin's and his Estate's and beneficiaries' rights under Sections 1, 10a, 14, and 16 of the Ohio Constitution by the acts and omissions described above in this Complaint.

182. It was foreseeable that Jacob Derbin would suffer injury or death from Defendants' conduct, described above.

183. The Police Defendants knew or should have known that their conduct would or could cause serious physical injury to Jacob Derbin and they disregarded that knowledge.

184. The Police Defendants' conduct directly and proximately caused the injuries and damages suffered by Jacob Derbin, his Estate, and his beneficiaries as described above.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands that judgment be entered in her favor on all counts and prays the Court to award the following relief:

A. An award of actual and/or compensatory damages to be determined at trial;

B. An award of punitive damages in an amount to be determined at trial for Defendants' willful, wanton, reckless, intentional, and malicious conduct;

C. Declaratory and injunctive relief against the City of Euclid Police Department enjoining policies, practices, and customs shown to encourage the use of excessive and unreasonable force and a code of silence, and ordering the institution of policies, procedures, and training for the EPD police to bring them into compliance with constitutional standards;

D. Attorneys' fees and the costs of this action pursuant to 42 U.S.C § 1988; and

E. An award of such other and further relief as the Court may deem just and proper.

**_TRIAL BY JURY ON ALL CLAIMS FOR RELIEF HEREBY DEMANDED._**

Date: May 9, 2026

Respectfully submitted:

_/s/ Jacqueline Greene_
Jacqueline Greene (0092733)
FG+G
35 East 7th Street, Suite 201
Cincinnati, Ohio 45202
T: 513-572-4200 / F: 216-621-0427
jacqueline@FGGfirm.com

_Counsel for Plaintiff_